TM:MSA
F. # 2014R00240

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**14 M 136**

- - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

FNU LNU #1 and
FNU LNU #2,

              Defendants.

- - - - - - - - - - - - -X

C O M P L A I N T

(18 U.S.C. § 1951)

EASTERN DISTRICT OF NEW YORK, SS:

        Shi-Yen Jeng, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

        On or about and between February 4, 2014 and February 12, 2014, within the Eastern District of New York and elsewhere, the defendants FNU LNU #1 and FNU LNU #2, together with others, did knowingly and intentionally attempt to obstruct, delay and affect commerce and the movement of articles and commodities in commerce, by extortion, to wit: the attempted extortion of an individual whose identity is known to the government, an owner of a package delivery business.

        (Title 18, United States Code, Section 1951)

        The source of your deponent's information and the grounds for his belief are as follows:[1]

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been involved in the investigation of numerous cases involving Asian organized crime, including extortion. I have been a Special Agent for approximately five years, and through my training, education and experience, have become familiar with organized crime activities, including extortion. I am familiar with the facts and circumstances set forth below from my participation in the investigation, my review of the investigative file and reports of other law enforcement officers involved in the investigation.

2. I am informed by an individual whose identity is known to the government ("I-1") that AZ Shipping ("A&Z") is a small, family owned and operated package forwarding business located in the Fresh Meadow neighborhood of Queens, New York. A&Z accepts packages from customers and arranges for their shipment by package delivery services such as UPS and DHL. In the ordinary course of its business, A&Z arranges for interstate and international shipment of packages.

3. I am further informed by an individual who works at A&Z and whose identity is known to the government ("I-2") that, on or about February 4, 2014, FNU LNU #1 ("Defendant #1"),[2] an unidentified Asian male, entered A&Z, paced around the store while speaking on a cellular telephone, and exited. Minutes later, Defendant #1 reentered A&Z and demanded to see "the boss." After I-2 informed Defendant #1 that "the boss" was not present, Defendant #1 took a photograph of I-2, sat down on a chair inside A&Z and watched as

---

establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware. Where recounted herein, all conversations and quotations are in sum and substance only, and based on draft translations of conversations that occurred in Mandarin Chinese.

[2] FNU LNU #1 is an Asian male, approximately 5' 8" tall with a thin build and medium-length straight black hair and an earring in his left ear. A photograph of FNU LNU #1 is attached as Exhibit 1.

3

business transpired. After a period of time, Defendant #1 approached I-2 at A&Z's counter and wrote a telephone number. Defendant #1 warned that I-2 should have "the boss" call the telephone number before 3:00 p.m.

4. I-2 further informed me that the next day, on February 5, 2014, Defendant #1 returned to A&Z at approximately 4:00 p.m. Defendant #1 demanded, "Where is the boss and why hasn't he called?" When informed that "the boss" was absent, Defendant #1 barged into a rear storage room inside of A&Z, attempted to open the rear door to the store and stormed out of A&Z. I-2 locked the door to A&Z immediately after Defendant #1 left.

5. A few minutes later, Defendant #1 returned to A&Z and attempted to open the door. Finding the door locked, Defendant #1 pounded his fist on the door and yelled, "You don't have to think about opening the door in the future. I'll be back every day." I-2 subsequently identified a still photograph of a video recording of Defendant #1, obtained later in the instant investigation as set forth below, as a photograph of the individual who had entered the store on February 4 and 5, 2014, demanding to see "the boss."

6. I have spoken with another individual who works at A&Z ("I-3"), whose identity is known to the government, and who was also present when the above-described events of February 5, 2014 transpired. I-3 corroborated I-2's account and added that, when exiting A&Z that day, Defendant #1 said to I-3, "If you tell the cops to get me, I will make sure you don't have an easy living." I-3 subsequently identified a photograph of Defendant #1, obtained later in the instant investigation as set forth below, as a photograph of the individual who had entered the store on February 5, 2014, demanding to see "the boss."

7. On February 5, 2014, I-1 engaged in a controlled recorded telephone call to the telephone number that Defendant #1 provided inside of A&Z on the previous day. After

speaking with Defendant #1 on February 6, 2014 as described below, I-1 identified the voice of the individual who answered the call as that of Defendant #1.[3] During the telephone call, Defendant #1 told I-1, that I-1 had taken "merchandise" that A&Z was supposed to ship and demanded that I-1 return it. When I-1 explained that he did not know what Defendant #1 was talking about, Defendant #1 threatened, "I will come back every day. I will keep my word. It would be no use for you to call the police. I won't fucking bring anything. I know that law more than you do. If this is how you want to play with me. You return the stuff that you took from others. Okay? Because my boss paid the money to retrieve his shipment of stuff, he had thought about not getting it back. If you don't care, that's fine. You don't have to open up."

8.   Later the same day, on February 5, 2014, I-1 placed another telephone call to the telephone number that Defendant #1 provided inside of A&Z on February 4, 2014. I-1 recognized Defendant #1's voice as the person who answered the call. During the controlled recorded call, I-1 informed Defendant #1 that, "Your actions are scaring my workers." Defendant #1 replied that, "I came to look for you that day because my boss sent me to talk to you nicely. To get the stuff back." Defendant #1 further stated, "You shipped the stuff to North Carolina." I-1 replied that I-1 did not know what Defendant #1 was talking about and said, "I don't have any merchandise being shipped to North Carolina." Defendant #1 explained, "I followed you for a long time. If I want to hurt you, I would've done it a long time ago. Who do you think I am? Don't be stupid. Do you think I am an informant?

---

[3]   I am proficient in Mandarin and have compared the voice on the recordings of the telephone conversations between I-1 and Defendant #1 with the voice of Defendant #1 captured on the audio and video recording of the in-person meeting between I-1 and Defendant #1, and I believe them to be the same.

Someone hired me to work here. To get the stuff back . . . Now I want to talk to you nicely . . . You think I have nobody? You think I would be scared?"

9. Defendant #1 stated, "You steal other people's merchandise." I-1 replied, "You got the wrong guy. I have never stolen any merchandise from other people." Defendant #1 stated, "I'll give you the benefit of the doubt. You didn't do it." I-1 asked, "Then why are you coming to me?" Defendant #1 answered, "They left the stolen merchandise with you. You shipped it out." Defendant #1 continued, "I don't care. You are at fault too. You shipped it out."

10. I-1 responded: "Exactly what do you want? Tell me?" Defendant #1 replied, "You already shipped the merchandise. You cannot get it back. Either you speak to my boss. How. How do you plan to reimburse him? Otherwise, you won't have peace. I am telling you. You use, you use the law with me. Or you use street power with me. That's all fine. I. I'll keep my word. I began by talking to you nicely. But you wanted to play with me. Now I don't want to talk to you nicely any more. But since you have called, we can still talk nicely. I'll ask you for the last time. How do you want to handle this matter?" I-1 said, "I don't even know. I never took any merchandise from you."

11. I-1 continued to protest that he did not steal merchandise and was unaware of any theft. Defendant #1 responded that, "At the end, I will make a phone call every day. 3-1-1. Counterfeit investigation squad. Do you want that? Police department." I-1 said, "No. Exactly what are you talking about?" Defendant #1 said, "This is how it's going to end up. I am telling you . . . I don't to get there. . . If you want to talk, let's talk nicely. You did take the stuff from others. Whether you took it or not, you shipped the stuff. You have to be responsible." I-1 asked, "What kind of stuff are you talking about?" Defendant #1 stated,

"Shoes. Bags. I can even tell you where you shipped it to." I-1 stated, "You shouldn't come to my store any more. When you come to my store, you scare them. They are all scared by you." The conversation concluded with I-1 and Defendant #1 arranging to meet the next day.

12. On February 6, 2014, I-1 spoke by telephone with Defendant #1 in an attempt to arrange a meeting. During the call, Defendant #1 alleged, "You are playing me. Right?" I-1 responded sarcastically, "Right. Right. I am." Defendant #1 said, "Your store previously delivered counterfeit bags. Counterfeit bags. You stole from other people. Where is your home? What is your name? We know all that. It's useless for you to say this now. Because we have a shipment of merchandise that you took. ... We fucking suffered a loss. Do you know what I mean? You. You don't let me live well. I won't fucking let you live well either." Defendant #1 continued, "If this is what you want to do, you can try it. We will play with you at any time. At the worst case, frankly speaking, you call the police. I'll fucking call the police too. Right? Your store doesn't need to open any more. It's that simple. You don't need to open up any more. You have been open for all these years. You don't need to open it any more." At the conclusion of the telephone call, I-1 and Defendant #1 arranged to meet later that day at a Starbucks in Queens, New York.

13. At approximately 5:00 p.m. on February 6, 2014, Defendant #1 and I-1 met inside a Starbucks in Queens, New York. I-1 was equipped with audio and video recording devices for the meeting. During the meeting, as set forth below, Defendant #1 and Defendant #2 appeared and spoke with I-1. The faces of both FNU LNUs were captured by I-1's video recording device.

14. To begin the meeting, Defendant #1 entered the Starbucks alone, sat at a table across from I-1 and told someone over his cellular telephone that, "I am with him. You

Case 1:14-cr-00318-DLI Document 1 Filed 02/11/14 Page 7 of 13 PageID #: 7

7

should talk to him. You should come in. In the corner." Defendant #1 said to I-1, "Talk. What's up?" I-1 replied, "I don't know why you guys come to me." Defendant #1 interjected, "No. You stole from us. We have to get it back." I-1 protested, "I have never stolen from anybody." Defendant #1 said, "How do you want to resolve this now? If you. If this is how you want to handle it, I am going to leave now."

15. After I-1 repeatedly stated that he did not steal from Defendant #1, Defendant #1 instructed I-1 to "Take your cell phone out. You don't have to make a recording and neither would I."

16. Defendant #1 accused I-1 of shipping counterfeit goods and storing them in his business, and stealing from others. Defendant #1 further accused I-1 of laundering money (I-1 runs a money remitting service from A&Z) and tax evasion.

17. I-1 told Defendant #1, "I really don't understand. You made us. My store can't even open now. You made all of us really scared. Losing our minds." Defendant #1 responded, "Did we do anything to you? We only came to your store to get an answer. Even if you call the police, it would be useless. Did I smash your store? Or beat your workers. No. I didn't." Defendant #1 said that he had taken photographs inside of A&Z of boxes containing counterfeit goods that were awaiting shipment. I-1 replied that he simply shipped packages.

18. After the disagreement reached a standstill, FNU LNU #2, an unidentified Asian male ("Defendant #2"),[4] entered the Starbucks and took Defendant #1's seat across from I-1. Defendant #1 remained standing nearby.

---

[4] FNU LNU #2 is an Asian male, approximately 5' 7" tall with a thin build and medium-length straight black hair. A photograph of FNU LNU #2 is attached as Exhibit 2.

19. I-1 reiterated that he had not stolen from the defendants and asked why they continued to accuse him. Defendant #2 said, "I told you that someone told us that you have our merchandise." Defendant #2 further stated, "Why would I come here if I know who received it? I only know that you have it."

20. After I-1 continued to deny stealing from the defendants and expressed ignorance of why they were targeting him, Defendant #1 said, "You are waiting for us to open our mouth to ask you for something. Then you can go to the police. You are. Whether you are recording this conversation or what not, you are wrong for taking the stuff from other people." Defendant #1 further said, "I don't need you to pay the full restitution. You only have to. You only have to make a gesture. You only have to let me get through this New Year." I-1 said, "I never stole from you. I will not pay any restitution to you." Defendant #2 said, "Do you still want to open up?" I-1 replied, "You can see that my store is closed today. It's not open. You guys come over every day." Defendant #2 said, "I am asking whether you wish to keep it open or not." I-1 replied, "Of course I wish to keep it open." Defendant #2 said, "Then you have to think about it." Defendant #1 interjected, "We would not come in to destruct anything. We would call the police... We would not come in to destruct anything. We are not that stupid." Defendant #2 said, "You don't need to open any more. I will accept the fact that I have had bad luck and put up with my losses."

21. Defendant #1 said, "You don't have to keep making it sound like we are messing with you. You. We are legitimate people. You took our stuff. We are here to get it back." The defendants denied extorting I-1.

22. Defendant #2 asked, "Have you shipped counterfeit bags?" I-1 responded, "I don't know. I don't get involved in customers' business." Defendant #2 said,

"Based on what you said today, I want you to pay restitution to me." I-1 protested, "I did not steal from you. How can you ask me for restitution?"

23.   Defendant #2 said, "No matter what, pay me some restitution and put this behind us. Afterwards. Let me put it this way. I'll make it worth your while. You don't have to pay me interest. I'll help you too. Let's be friends. When you have issues, you can call me." Defendant #2 continued, "If you need something, call me. As long as I can help you, I would. No biggie. Even the police department, I can take care of it. What else you think I can't handle... If you need something out there, you can call me." I-1 asked, "How much do you want." Defendant #2 answered, "You tell me. It depends on your sincerity." I-1 said, "You guys tell me... Because my store cannot even continue to operate." Defendant #2 said, "I know. I'll listen to you. It's okay. Anything happens down the road, I'll help you. Alright? Your issue is our issue."

24.   Defendant #1 said, "The stolen goods were more than $100,000." Defendant #2 told Defendant #1, "Shut up. I don't want to talk about this now." Defendant #2 said, "Today we get to know each other. Right? At the minimum, if there's something you need help with, let me know." I-1 said, "You guys don't mess with me, I would be fine." Defendant #2 responded, "We won't. Don't worry. This is the end of it. I have no reason, no reason to come back to you." Defendant #2 further said, "After our chat today, tomorrow you don't have to worry. Boldly open up. Nothing would happen. Anyone messing with you, you call me. Once you call me, I'll come right over. I won't say much. Anything in

Flushing. Anyone giving you problems, be it Wenzhounese or Fuzhounese people, call me. I'll resolve it for you."[5]

25. After a back-and-forth over who would propose the amount of the payment, I-1 said, "You tell me . . . I come to you today because I want to resolve this matter as soon, as soon as possible. Then tomorrow or the day after I can, can, open. Open up." Defendant #2 then held his hand up with three fingers raised. I-1 asked, "How much is this?" Defendant #2 said, "You tell me." I-1 asked, "What you gestured is $3,000 or $30,000?" Defendant #2 said, "You tell me." Defendant #2 elaborated, "I look at you for half a day now. Three. Then you ask me how many zeroes are behind it?" When I-1 said that $30,000 was too much, Defendant #2 asked, "How much do you wash?" Defendant #2 continued, "That's really not too much. I'll tell you. If I want to bite down, I'll tell you, I can bite you really hard." Defendant #2 instructed, "You think about it. Alright?" I-1 said, "Let me think about it . . . I still, still want to keep my store running."

26. On February 9, 2014, I-1 engaged in a controlled recorded telephone call with Defendant #2. During the call, I-1 asked for time to pay the defendants. Defendant #2 responded that the defendants did not want money from I-1, but rather wanted their "merchandise" returned. I-1, confused, said that he did not have any "merchandise" and inquired what he was supposed to do. Defendant #2 instructed the defendant to speak to his "boss," with whom I-1 would agree to a written contract, affirmed by the parties' fingerprints, establishing the amount of money that I-1 was to pay. Furthermore, the contract was to

---

[5] Based on my training, experience and information learned during the investigation, I believe that, in context, Defendant #2 referred to "Wenzhounese" and "Fuzhounese" as individuals from specific areas of Mainland China who engage in criminal conduct.

contain a clause in which I-1 agreed that the defendants had not extorted him. Defendant #2 and I-1 agreed that the parties would speak a few days later and arrange a meeting. Defendant #2 agreed that, in the meantime, the defendants would not impede A&Z's business or harass its employees.

   WHEREFORE, your deponent respectfully requests that arrest warrants be issued so that the defendants FNU LNU #1 and FNU LNU #2 may be dealt with according to law.

                _____
                  SA Shi-Yen Jeng
                  Special Agent Shi-Yen Jeng
                  Federal Bureau of Investigation

Sworn to before me this
11th day of February, 2014

_____
THE HONORABLE STEVEN M. GOLD
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK



